[Cite as *In re M.J.*, 2015-Ohio-3327.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: M.J.
     R.J.
     I.S.
     I.S.
     W.W.
     R.R.

C.A. No.     27741

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.   DN 13-4-234
             DN 13-4-235
             DN 13-4-236
             DN 13-4-237
             DN 13-4-238
             DN 13-4-239

DECISION AND JOURNAL ENTRY

Dated: August 19, 2015

HENSAL, Presiding Judge.

{¶1} Appellant, Cedrina S., ("Mother") appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her six minor children and placed them in the permanent custody of Summit County Children Services ("CSB"). This Court affirms.

I.

{¶2} Cedrina S. is the mother of six children: M.J., born October 23, 1998; R.J., born November 23, 2000; twins I-h.S. and I-c.S., born January 8, 2004; W.W., born March 6, 2007; and R.R., born May 14, 2008. Robert J. is the father of M.J. and R.J. Warren W. is the father of W.W. and R.R. The father of the twins was never determined. None of the fathers or alleged

fathers of the children actively participated in the case or appealed from the judgment of the trial court.

{¶3} This matter is the second custody case involving CSB and this family. In the first case, Mother reportedly left the children alone very late in the evening of March 22, 2011, to go food shopping, when police found one of the children outside the home, pounding on the door to get inside. The police discovered that the home was in deplorable condition and that there were insufficient beds for the children. All six children were removed from the home at that time, and CSB became involved. After a year of case planning services, the court found that Mother was keeping appointments for the children and that the condition of the home was appropriate. The children were gradually returned to Mother's custody, and all of them were returned by May 11, 2012.

{¶4} Before long, CSB was again receiving concerning reports about the family. The reports alleged that the children were not regularly attending school or were not arriving on time, were falling asleep in school, and may not have been receiving adequate food at home. Several of the children claimed they were staying up all night to make sure they got to school because Mother did not get up with them and they were not permitted to wake her. R.J. was responsible for giving I-h.S. his prescribed medication for attention deficit hyperactivity disorder ("ADHD") and for supervising I-h.S.'s home-reading each evening. In turn, I-h.S. was responsible for waking his kindergarten brother, W.W., helping him get ready for school, and walking him to school. Mother was said to be not attending meetings at school or taking the children to their counseling appointments. Significantly, CSB social workers made multiple visits to the home to follow up on these concerns, but Mother refused to grant the agency access to the home or the children.

**{¶5}** Accordingly, on April 3, 2013, based on concerns that the children's basic needs were not being met, CSB filed a complaint in juvenile court, alleging that all of the children were dependent. The agency sought orders for access and protective supervision. The court immediately ordered Mother to provide CSB with access to evaluate the condition and environment of the children. Thereafter, following a hearing and upon Mother's agreement, the trial court granted temporary protective supervision to CSB.

**{¶6}** At adjudication, the magistrate found that fifteen-year-old M.J. had experienced several psychiatric hospitalizations as well as residential treatment. Her whereabouts were currently unknown, and a warrant was pending for her arrest based on a probation violation. The twins had been without their prescribed medications for ADHD and medical attention for some time. The behavior of one of the twins, I-c.S., had deteriorated to the extent that he was transferred to an alternative school. Both of the twins as well as W.W. had excessive absences and multiple tardy arrivals at school. Mother was often late in picking up the children after school. CSB service providers claimed that Mother reported having difficulty managing the children's behavior. The children were adjudicated dependent.

**{¶7}** The agency changed its dispositional request from protective supervision to temporary custody, and the trial court granted temporary custody to CSB at the time of disposition. The trial court also adopted the case plan proposed by CSB as an order of the court.

**{¶8}** Mother's case plan, as amended, required her to obtain and maintain a safe, clean, and stable home; comply with all medical, dental, and developmental appointments for the children; follow the recommendations from the children's therapeutic providers; attend all school meetings regarding the children; provide for the children's emotional and financial needs; complete a psychological/parenting evaluation and follow all recommendations. Upon

completion of the evaluation, the following recommendations were made: successfully complete individual mental health counseling aimed at developing insight and accountability for her responsibilities as a parent, as well as developing pro-social behaviors and reducing criminogenic behaviors; successfully complete parenting classes to learn basic care of children and develop effective parenting skills; and submit to regular drug screens due to minimization of past negative behaviors.

{¶9} The trial court granted a six-month extension of temporary custody in March 2014. On July 7, 2014, CSB moved for permanent custody of the six children. Following a hearing, the trial court granted permanent custody to CSB and terminated the parents' parental rights. Mother has appealed and has assigned one error for review.

II.

### Assignment of Error

THE TRIAL COURT ERRED IN ITS DECISION WHICH TERMINATED MOTHER'S PARENTAL RIGHTS AND PLACED THE CHILDREN IN THE PERMANENT CUSTODY OF SUMMIT COUNTY CHILDREN'S SERVICES AS IT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶10} Mother contends that the permanent custody decision of the trial court is against the weight of the evidence. Revised Code Section 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody to a public services agency. The statute requires the court to find, by clear and convincing evidence, that: (1) one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) apply, and (2) permanent custody is in the best interest of the child. R.C. 2151.414(B)(1). Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶11} The trial court found that the first prong of the permanent custody test was satisfied because the children had been in the temporary custody of CSB for at least 12 of the prior 22 months. Mother has not contested that finding, but has instead challenged the finding that permanent custody is in the best interest of the children. When determining whether a grant of permanent custody is in the best interests of children, the juvenile court must consider all the relevant factors, including those enumerated in Section 2151.414(D): the interaction and interrelationships of the children, the wishes of the children, the custodial history of the children, and the children's need for permanence in their lives. *See In re R.G.*, 9th Dist. Summit Nos. 24834 & 24850, 2009-Ohio-6284, ¶ 11. "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith*, 9th Dist. Summit No. 20711, 2002 WL 5178, *3, (Jan. 2, 2002); *see also In re Palladino*, 11th Dist. Geauga No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.

{¶12} At the time of the permanent custody hearing, the children ranged in age from 6 to 16. All but the youngest have been placed in therapeutic foster homes. There is no evidence of a significant bond between any of the children and their fathers or with any other friends or relatives besides Mother. Because the children have significant but varied needs, we address them separately.

{¶13} The oldest child, M.J., has been diagnosed with suicidal ideations and an alter ego. She has had several psychiatric hospitalizations. At the beginning of this case, she exhibited aggressive behavior and was placed in Belmont Pines, a children's behavioral health hospital. She was later placed in a therapeutic "mentor home" and, according to the caseworker, has done well in that placement, with progress in counseling and improved behavior. She has an Individualized Education Program ("IEP") in school to address mental health concerns.

{¶14} R.J., the next oldest child, has been diagnosed with an adjustment disorder and symptoms of depression. He was placed with W.W. at one point, but was moved because of his aggressive behavior towards W.W. He is engaged in therapy with Barbara Casline. The guardian ad litem described R.J. as being much improved, despite a recent regression that he believes is related to the permanent custody hearing and the uncertainty about his future.

{¶15} The two youngest children, W.W. and R.R., are also engaged in therapy with Ms. Casline. Eight-year-old W.W. has been diagnosed with an adjustment disorder. He did not speak much at first, but his language and social skills have improved. He has difficulty demonstrating his emotions and has some acting-out behaviors. W.W. has had a difficult adjustment and has been in a couple different placements. He is currently placed with a foster mother who is in her 60s, and he is doing well there. He resides on the same street as R.J., and W.W. is said to now enjoy spending time with R.J.

{¶16} Six-year-old R.R. has been diagnosed with an anxiety disorder. Ms. Casline is attempting to get her to express her feelings and to decrease her emotional outbursts. R.R. has had a difficult time adjusting to the removal from her home and dealing with the uncertainty of where she will be living. She enjoys visits with Mother and is sad when Mother misses visits or they are cancelled. R.R. often talks about Mother and her siblings.

{¶17} Ms. Casline believes the three children with whom she has worked, R.J., W.W., and R.R., have all made progress, but does not anticipate discharging any of them from therapy soon. She believes continued therapy would be beneficial for them and states that they need stability.

{¶18} The twins are the middle children. Both of them take several prescription medications daily. Both had mental health assessments in 2013 and have been engaged in

therapy since then. Psychiatrist Elizabeth Stern testified that both boys have difficulty managing anger and feelings, expressing themselves, solving problems, getting along with peers, and communicating with adults. Both boys have been diagnosed with ADHD and have IEPs at school. In addition, Dr. Stern diagnosed I-c.S. with mild mental retardation and rule-out of pervasive developmental disorder. He receives mentoring and coaching for autism spectrum symptoms. I-c.S. is extremely angry and aggressive, and he has been violent to himself, his brother, peers, and adults at school. His progress has been difficult, but he has made some improvements in managing his anger. Dr. Stern diagnosed the other twin, I-h.S., with a mood disorder, along with symptoms of depression and anxiety. I-h.S. is a little more communicative than his twin and has done well in school. He tries to protect his twin brother and attempts to mitigate his behaviors. Since May 2014, he has refused to attend visits with Mother and his other siblings.

{¶19} Allison Metz provides weekly therapy to both twins. In their sessions, she has focused on decreasing oppositional behaviors including verbal and physical aggression, improving social skills and ability to follow rules, and helping them communicate needs and feelings. Ms. Metz testified that it is still difficult for the boys to discuss their fears or emotions, and they speak little of Mother.

{¶20} The psychiatrist, therapist, and guardian ad litem all emphasized that the twins should continue with their mental health treatment. According to the experts, the twins require a high level of involvement by their caregivers to tend to their multiple appointments, manage their medications, and maintain contact with their service providers. They need a structured environment, consistency and a lot of monitoring. Dr. Stern commented that "there are many loving parents who still cannot make that level of care possible."

{¶21} The record reveals that Mother and the children share a close bond and the children also share a bond with each other. The children were said to always be excited to see Mother at visits. The visits were deemed appropriate, affectionate, and without problems except for some reports of behavioral issues surrounding visits. There were also allegations that Mother made unfulfilled promises of gifts and of their return to her home.

{¶22} Despite testimony that Mother and the children were closely bonded and evidence that four of the children consistently wanted to return to Mother, the record reflects that the twins did not want to return to Mother and preferred to be adopted instead. The twins have behaved differently from each other in regard to their participation in visits. I-c.S. attended visits with Mother and his siblings throughout the case, although in October 2014, his visits were decreased in frequency from weekly to monthly on the recommendation of Dr. Stern based on reports of behavioral problems surrounding visits. Further, even if parental rights were terminated, I-c.S. expressed an interest in continuing to visit with Mother and his siblings. I-h.S., on the other hand, refused to attend any visits with his family from May 2014 until the close of the permanent custody hearing in February 2015, and he expressed no interest in future visits.

{¶23} On appeal, Mother claims that the trial court failed to address what detrimental effects may have arisen due to the lack of visitation by I-h.S. Mother also claims that she was not aware that the matter was brought up to the trial court. In general, it is concerning to this Court when there is a lack of opportunity for children and parents to share visitation time when children are removed from the home of their parents and are in the temporary custody of a children services agency. In this case, the record demonstrates that CSB brought the issue of I-h.S.'s refusal to attend visits to the attention of the trial court and Mother by written notice filed on May 22, 2014. According to that notice, I-h.S. reported that Mother threatened him during a

visit and that he was afraid of her. The notice also indicated that the matter was being therapeutically addressed in the child's weekly counseling sessions. Thereafter, the issue was judicially considered at a hearing before the magistrate on July 8, 2014. The record demonstrates that Mother and her attorney were present at the hearing. Based upon the evidence adduced, the magistrate found that I-h.S. was fearful of Mother and that Mother and R.J. had picked on him at visits. At that time, the court did not order the agency to require I-h.S to attend visits.

{¶24} Mother did not object to the decision by the magistrate, nor did she file any subsequent motions with the court to require I-h.S. to either participate in visits or to otherwise pursue some sort of involvement with him, such as through joint counseling. Mother had an opportunity to cross-examine both the child's psychiatrist and his counselor at the permanent custody hearing, but did little, if anything, to explore this issue with them. In fact, Mother's attorney declined to pose any questions to the counselor. We agree with the caseworker that the lack of visitation for this amount of time is "upsetting." Nevertheless, because Mother did not protect or pursue this issue before the trial court, perhaps making a tactical decision, we will not now speculate on the possible impact of the lack of visitation by this child upon him, his siblings, or the ultimate decision to terminate parental rights.

{¶25} Despite the multitude of appointments, medical needs, and special needs of these children, Mother testified that she believes she can provide care for them. She points to the fact that the twins were born three months early and she cared for them. Also, she notes that she recently learned of services she can access to transport her children to their medical appointments.

**{¶26}** The record does not support a conclusion that Mother would be able to provide suitable care for her children on a permanent basis, however. Mother's psychological evaluation indicated a diagnosis of antisocial personality disorder, with patterns of irresponsibility. The psychiatrist questioned Mother's ability to understand basic parenting because Mother minimized the needs of her children even though they were quite serious. For example, Mother understood that M.J. had a mental health diagnosis and a history of psychological hospitalizations, but minimized whether that impacted her ability to babysit her siblings. In addition, the evaluation found that Mother had limited insight and judgment and tended to blame others for her problems. The evaluating psychologist found her to have a history of non-compliance with her children's appointments. She was said to fail to plan ahead and have difficulty identifying the potential consequences of her actions. As a parent, she has failed to recognize her children's needs, both medically and psychologically.

**{¶27}** Furthermore, despite Mother's claim that she substantially complied with her case plan and could have completed it within a six-month extension, the record reveals that she accomplished only minimal compliance with the objectives of her case plan. Mother has failed to demonstrate that she remedied the problems that caused the removal of the children or that she likely could have done so within the time of an extension. As to housing, Mother was transient for most of the case, staying with the maternal grandmother and friends until she obtained a lease on a home in October 2014, just one month prior to the start of the permanent custody hearing. The guardian ad litem and the caseworker expressed concern with the continued stability of this housing arrangement because Mother was not employed and had no income. Mother testified that her boyfriend of two years had paid the first few months of her rent and utility bills. Mother anticipated continuing to rely on the financial assistance of her current boyfriend along with

social security from the twins to maintain housing in the future. Her boyfriend does not reside in the home, is not on the lease, and is not the biological father of any of the children.

{¶28} Mother has not secured employment during this case, except very briefly, and she provided no documentary evidence of that employment. Mother said that she has been too ill to hold a job but that she is nevertheless able to provide child care. Mother claims that her health has improved, and she expects to seek employment in the near future. At the same time, she has recently applied for social security disability insurance, has been in and out of the hospital during the last three months, and missed several recent visitations due to her health issues.

{¶29} In further regard to her health, Mother explained that she has gotten sick every winter since 2012. Her physical condition renders her almost "immobile" during the winter months as she does not want to leave her home. Mother has admitted that her health has prevented her from working, attending counseling, and visiting her children on recent occasions. Mother testified that she has been diagnosed with hypokalemia, a potassium deficiency, which makes her muscles weak and causes disorientation. She has also been diagnosed with anemia, nausea, a benign pituitary tumor, chronic migraines, and anxiety. Mother claims to be unable to take buses because of breathing and heart issues, and she does not have a driver's license.

{¶30} In support of her argument that she substantially complied with her case plan, Mother points out that she completed the requested psychological/parenting evaluation. The results of that evaluation required Mother to engage in mental health counseling, do weekly drug testing, and complete parenting classes. Mother completed the intake procedure for mental health counseling but failed to engage in any counseling at all. According to the records custodian for Coleman Services at St. Thomas Hospital, Mother was discharged from that counseling program in February 2015, because of her failure to attend. This case plan objective

was intended to be directed largely at developing insight and accountability for Mother's responsibilities as a parent.

**{¶31}** Mother completed only one drug test, which was positive for benzodiazepines and opiates in November 2013. Mother claims the positive results were due to prescription medications but failed to provide documentary evidence of that and completed no further drug tests. The caseworker stated that there were no substance abuse concerns during the first case or in the complaint of the present case. The requirement appears to have been included as the result of a recommendation in Mother's psychological/parenting evaluation. Accordingly, while substance abuse does not appear to be a significant issue in this case, Mother's failure to produce a prescription for the drugs revealed by her drug test or to submit to any additional drug testing is troublesome.

**{¶32}** Mother completed parenting classes at Helping Hearts in November 2014, but important concerns remain as to Mother's ability to parent her children. Mother missed 28 of 85 visits with her children, nearly one third of the scheduled visits. In the three months before the final day of the permanent custody hearing, Mother missed half of the 12 scheduled visits. Mother claims she missed these six recent visits due to illness and transportation problems, the same problems that existed at the beginning of the case. Mother failed to move beyond supervised visitation at the visitation center.

**{¶33}** The caseworker testified, without objection, that she had requested a continuance in the midst of the permanent custody hearing from December 2014 until February 2015 "to give [M]other the benefit of the doubt" and give her an additional three months to work on her case plan objectives. Yet, during that time Mother made no meaningful progress on those obligations. In addition to her failure to regularly attend visits with her children, Mother failed to attend any

mental health counseling sessions. Mother attributes these failures to her health and lack of transportation. Thus, despite her claim that she is able to care for her children, there is little evidence that Mother is able to provide consistent and stable care for her children.

{¶34} As discussed above, both twins expressed a desire to not return to Mother but, rather, to be adopted. The other four children have consistently expressed the wish to return to live with Mother. They conveyed their wishes to the guardian ad litem and, because his recommendation conflicted with those wishes, separate counsel was appointed to represent those four children.

{¶35} The guardian ad litem testified at length explaining his position that permanent custody is in the best interests of the children. He agreed that there is a bond between Mother and the children. He reported that four of the children love their mother and "really, really want to be with her." Nevertheless, he explained that the case is nearly two years old and that Mother has completed few matters on her case plan. He expressed concern with Mother's ability to provide a stable, permanent home for her children for several reasons. Her housing is problematic because of Mother's dependence on a boyfriend to finance it. Her current medical issues inhibit her ability to hold a job. Her failure to address the mental health component of her case plan raises questions. The children have mental health issues themselves, and Mother needs to understand her own mental health issues as well as how to parent her children. He stated that it is unclear how Mother would care for the children on a daily basis and address their medical issues. He did not believe she could care for the children given medical issues that currently prevent her from even getting out of the house to visit them. He believed that the four children (all but the twins) would be "a handful" for any adult to handle.

**{¶36}** The guardian ad litem stated that severing the parental bond could result in some adjustment problems for the children but specifically noted that the oldest child had "made peace" with the possibility that she may not be returned to Mother through her conversations with her therapist. He also believed that "all the current foster care providers, as well as the service providers are willing to work through any issues the children have." He believes that the current foster parents would work together and provide an ongoing opportunity for the children to continue their relationships. He concluded that the children need permanency and recommended permanent custody as being in the best interests of the children.

**{¶37}** The custodial history of the children indicates that they resided with Mother until they were removed from her home in March 2011. They were returned to her custody by May 2012. The children were again removed in March 2013 in the present case and have remained in the custody of CSB until the permanent custody hearing, concluding in February 2015. Some of the children have been in multiple placements during the pendency of this case. They are currently placed in five different foster homes.

**{¶38}** The evidence of record supports the conclusion that the only way to provide these children with a legally secure permanent placement is through permanent custody. The trial court properly found that Mother had not made substantial progress on her case plan and had not remedied the problems that caused removal. None of the fathers were interested or suitable for placement. Several relatives were considered for placement, but none were determined to be suitable. The caseworker testified that she believed permanent custody is in the best interests of all the children. She stated that Mother has had difficulty just taking care of herself, let alone six children with so many needs. These children have been in foster care for nearly three of the last four years. They have multiple needs that require numerous appointments and significant

attention. Mother has been unable to meet their needs in the past, and there is a lack of evidence to indicate that she can do so now.

{¶39} Our review of the evidence supports the conclusion that permanent custody is in the best interests of the children. Mother has not demonstrated that the trial court erred in reaching a similar conclusion. Thus, we cannot conclude that the decision of the trial court was against the weight of the evidence. Mother's sole assignment of error is overruled.

III.

{¶40} Mother's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

> JENNIFER HENSAL
> FOR THE COURT

CARR, J.
MOORE, J.
CONCUR.

APPEARANCES:

HOLLY KEHRES FARAH, Attorney at Law, for Appellant.

BRENDON KOHRS, Attorney at Law, for Children.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

MICHAEL GOEBL, Guardian ad Litem.